## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Casey Anderson, being first duly sworn, hereby deposes and states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2019. The FBI has jurisdiction over offenses that occur in the special aircraft jurisdiction of the United States.

2. I write this affidavit in support of a criminal complaint charging Kristina Kedysheva (Kedysheva) with violations of Title 49, United States Code, Section 46504 and Title 18, United States Code, Section 113(a)(4). I have obtained the information contained in this affidavit from my own investigation and from my discussions with and review of investigative reports and documents prepared by other FBI Special Agents and members of the U.S. Air Marshals.

## STATEMENT OF PROBABLE CAUSE

4. At approximately 11:40 a.m. (EST) on September 8, 2026, the FBI received word that United Airlines flight 18 (UA 18) from Milan, Italy to Newark, New Jersey reported a female passenger was non-compliant and was assaulting flight attendants and that the captain of the flight had decided to divert the flight to Bangor International Airport ("BIA"). I proceeded to BIA to investigate further and was joined by other FBI Special Agents and members of the U.S. Air Marshals and Bangor Police Department. Upon arrival, I learned that the non-compliant passenger, Kedysheva, had already been removed from the aircraft by local police and border officers.

5. I learned the following from speaking with FBI Special Agent Seamus

Power, who was told the following in substance by a flight attendant (FA1):

A. FA1 was the Purser flight attendant, meaning the crew leader, on flight UA 18 from Milan, Italy to Newark, New Jersey. FA1 was assigned to the first-class section in the front part of the airplane. FA1 was in the front of the airplane when another flight attendant, FA2, called FA1 to the back deck portion of the airplane for assistance with a passenger, later identified as Kedysheva, who had been drinking too much and would not return to her seat.

B. FA1 was told by other flight attendants that Kedysheva had already been served multiple drinks on the flight and that Kedysheva became loud and aggressive with the flight crew when they refused to serve her more alcohol.

C. Kedysheva spoke some English and some Italian. FA1 spoke to Kedysheva in English, but another flight attendant, FA3, translated FA1's statements into Italian. Using this method, FA1 informed Kedysheva that she would not be served more alcohol and persuaded Kedysheva to return to her seat.

D. FA1 contacted the captain and updated the captain on the situation. While FA1 was on the phone with the captain, Kedysheva returned to the back flight deck area and demanded to be served more alcohol.

E. FA1 requested the captain turn on the "fasten seat belts" sign, which the captain did. FA1 informed Kedysheva that she was required to return to her seat. Kedysheva did not comply with the order. The captain also told

FA1 that if Kedysheva did not return to her seat then the flight would be grounded. FA1 told Kedysheva what the captain said, and Kedysheva did not return to her seat.

F. Kedysheva began to film the flight attendants and refused to return to her seat. FA1 told other flight attendants that Kedysheva would need to be restrained and restraints would be needed. Flight attendants went to retrieve the restraints and returned with the restraints and with several able-bodied people (ABP) to assist. When flight crew and the ABP attempted to place Kedysheva in restraints, Kedysheva "fought them off."

G. Kedysheva was eventually taken to the ground, and while FA1 was attempting to control Kedysheva's right arm, Kedysheva turned and bit FA1 on the wrist. FA1 later attempted to restrain Kedysheva's legs, and Kedysheva kicked FA1 in the upper stomach, causing FA1 to fall into a passenger and injure FA1's shoulder.

H. When Kedysheva was eventually placed in restraints, Kedysheva complained that the restraints were too tight. Flight crew placed looser restraints on Kedysheva and cut off the tighter restraints. Once the loosened restraints were the only ones in place, Kedysheva attempted to escape from the restraints, causing them to be tightened as well.

I. As a result of the altercation, FA1 was injured and required medical treatment, and FA1 was taken away from FA1's duties as Purser completely and was no longer able to provide care and service to the first-class

passengers.

J. I reviewed photographs of FA1's injuries taken by agents. Light indentations are visible on FA1's wrists and some discoloration is present where the bite occurred, however, I could not clearly identify bite marks from the photograph.

6. I learned the following from speaking with FBI Special Agent Seamus Power, who was told the following in substance by a flight attendant (FA2):

A. After the mid-service portion of the flight had been completed, a female passenger, later identified as Kedysheva came to the rear flight deck and demanded to be served more alcohol, specifically a "whisky and coke." FA2 and FA3, who spoke Italian, informed the passenger that she had too many drinks and they would not serve her a whisky and coke. Instead, FA2 gave the passenger a cup of water and a cup of wine and encouraged the passenger to return to her seat.

B. Roughly 15 minutes later, Kedysheva and asked for more alcohol. FA2 informed Kedysheva that she would not be served more alcohol. Kedysheva began yelling at FA2 and FA3. In response FA2 called for the Purser, FA1, to come and assist with the situation.

C. FA1 calmed Kedysheva and convinced Kedysheva to return to her seat, but shortly after Kedysheva returned and demanded more alcohol.

D. FA1, FA2, and FA3 all told Kedysheva to return to her seat, and Kedysheva was informed that if Kedysheva did not return to her seat the plane would

be grounded.

E. When the decision was made that Kedysheva needed to be restrained, FA2 called for ABPs to assist in restraining Kedysheva. While other crew and the ABPs attempted to restrain Kedysheva, FA2 moved people out of the back row of the aircraft so Kedysheva could be seated there once she was restrained.

F. After the altercation with Kedysheva, FA2 had to attempt to reassure worried passengers who observed the incident that they were safe.

7. I learned the following from speaking with FBI Special Agent Seamus Power, who was told the following in substance by a flight attendant (FA3):

A. FA3 was a flight attendant on a flight from Milan, Italy to Newark, New Jersey. FA3 was one of the two Italian-speaking flight attendants on the aircraft. FA3 was in the rear flight deck of the aircraft when a female passenger, later identified as Kedysheva who appeared to be drunk, came and asked to be served more alcohol. FA3 recalled that this instance was the 4th time that Kedysheva had returned to the flight deck asking for alcohol.

B. Kedysheva was slurring her words and using a combination of English, Russian, and Italian. FA3 attempted to communicate with Kedysheva in Italian. Kedysheva appeared to understand and then began demanding to be served alcohol in both English and Italian. Kedysheva also called the flight crew "racist" for refusing to serve her more alcohol.

C. Kedysheva was told to return to her seat by flight crew but did not comply with the instructions.

D. When Kedysheva was restrained by flight crew and ABPs, FA3 attempted to keep other passengers calm.

8. I learned the following from speaking with FBI Supervisory Special Agent Wess Brooker, who was told the following in substance by a flight attendant (FA4):

A. FA4 was a flight attendant on UA 18 and had been a flight attendant for approximately 25 years.

B. FA4 provided service to Kedysheva on one occasion and served Kedysheva a red wine.

C. FA4 went on break, and when FA4 returned from break, FA4 saw Kedysheva seated on the ground on the left side of the aircraft, "screaming and thrashing." FA4 could hear Kedysheva scream while refusing to get off the ground and asking for her phone.

D. FA4 saw FA 1 standing near Kedysheva. FA4 then saw that FA1 was suddenly knocked off balance and fell towards the center of the aircraft, landing on a passenger. FA4 judged that due to FA1's position next to Kedysheva, and due to FA1's sudden movement and fall, Kedysheva had kicked FA1 in the middle area of the torso.

E. FA4 assisted FA1 after FA1 was kicked. FA1 was having a hard time breathing. FA4 helped FA1 to a forward facing jump seat and asked for medical assistance from any doctors on board. Five passengers volunteered to assist FA1. FA4 completed a "medlink" checklist to assess the severity of FA1' s injuries. Around this time FA4 identified that FA1 had been bitten on the wrist. FA4 communicated what happened to the captain.

F. As a direct result of the altercation with Kedysheva, the injuries to crew members that resulted from it, and the need to restrain Kedysheva, FA4 was prevented from conducting the normal duties associated with the flight attendant role. The regularly scheduled service for that portion of the flight was not preformed, and FA4 instead had to medically assist FA .

9. I conducted an interview with another flight attendant (FA5) who told

me the following in substance:

A. FA5 was on a break when the altercation began.

B. FA 5 returned from break early to assist. When an incident with a passenger happens on board the aircraft, the roles of flight crew change from standard roles. The individuals who are engaging with the problem passenger have to focus on that person. All other crew suspend any form of service and become "runners," meaning they provide assistance by getting supplies and resources to the flight crew dealing directly with the passenger.

C. In this instance, FA5 was a "runner." FA5 expected to begin a snack and drink service when FA5 returned from break but due to the incident, the service was canceled and the flight was diverted.

10. I learned the following from speaking with FBI Supervisory Special Agent Wess Brooker, who was told the following in substance by an able-bodied person who assisted with restraining Kedysheva (ABP1):

A. ABP1 was a passenger aboard UA 18 sitting in row 41. Partway through the flight ABP1 observed a woman, later identified as Kedysheva talking to two flight attendants. One of the flight attendants appeared stressed and serious; ABP1 recalled, "I could tell she was scared." ABP1 volunteered to the flight attendant to help if it was needed but then returned to his seat.

B. Approximately, five minutes later, the flight attendant came to ABP1 and asked for help. ABP1 went towards the back of the plane where the flight attendant said "we have to handcuff her," referencing Kedysheva.

C. Kedysheva was speaking Russian, Italian, and broken English while swinging her phone around. ABP1 could smell alcohol on Kedysheva, told her to calm down in Italian. Kedysheva became more agitated.

D. While ABP1, flight crew, and other passengers were trying to talk to Kedysheva and calm her down, ABP1 saw Kedysheva move to put her hands on the aircraft door. This motion caused ABP1 and others to worry Kedysheva was attempting to open the door, at which point ABP1 and other ABPs attempted to restrain Kedysheva.

E. Eventually, Kedysheva ended up on the floor. While she was there, a flight attendant was trying to calm or stabilize Kedysheva. ABP1 saw Kedysheva turn her head and bit the flight attendant on the wrist.

F. ABP1 went to speak to tell his spouse he was ok. When he went back to the

area near his seat he saw Kedysheva kick the flight attendant and knock her into another passenger

11. I learned the following from speaking with FBI Special Agent Seamus Power, who was told the following in substance by an able-bodied person who assisted with restraining Kedysheva (ABP2):

A. ABP2 was a passenger on UA 18 sitting in row 41. During the flight another passenger, ABP1, asked ABP2 to help flight attendants who needed assistance with a passenger. When ABP2 found out that the flight attendants needed help restraining another passenger, ABP2 asked for the flight attendant's permission before doing anything.

B. ABP2 didn't touch the other passenger until he saw her move close to the outer, rear door. ABP2 wasn't sure if the passenger was going to try and open the door so he grabbed her.

C. ABP2 recalled that "This is when things got crazy." The passenger started yelling and eventually the flight crew and the passengers assisting the flight crew got the woman onto the floor to restrain her.

12. I learned the following from speaking with FBI Special Jennifer Misek, who was told the following in substance by an able-bodied person who assisted with restraining Kedysheva (ABP3):

A. ABP3 was a United Airlines pilot based out of Newark, NJ. ABP3 was traveling off duty as a pilot on the aircraft and was a jump seater, meaning that ABP3 was traveling without an assigned passenger ticket due to ABP3's position as off duty crew. ABP3 was sitting in seat 1A. FA1 called for able bodies to assist and requested ABP3 assistance specifically. ABP3 went to the back of the aircraft to help with a female passenger, later identified as Kedysheva, who would not sit down or comply with the flight attendants.

B. The flight crew determined that Kedysheva needed to be restrained, and when the zip tie restraints became visible, Kedysheva "went nutty." Kedysheva began flailing and swinging her phone around; ABP3 believed it took three to five individuals to take her down to the ground where the restraints could be placed on her.

C. When Kedysheva was on the ground, ABP3 saw Kedysheva bite FA1 on

FA1's right wrist.

D. ABP3 confirmed that ABP3 had observed Kedysheva reaching for the handle of the read exterior door on for the airplane before flight crew or ABPs made physical contact with Kedysheva.

E. When Kedysheva was placed in restraints, Kedysheva would not comply with directions to stand up and complained about how tight the restraints were, so they were replaced. Eventually, Kedysheva was placed in the last row of airplane seating, where she began to struggle again. At this time Kedysheva kicked FA1. Kedysheva was then placed in the window seat and ABP3 sat next to her.

F. Kedysheva complained about how tight the restraints were, so flight crew attempted to replace them again, at which point Kedysheva began to struggle again. Because Kedysheva was struggling, the restraints were not switched. During this interaction Kedysheva scratched ABP3's arm with her fingernails. ABP3 required treatment by medical professionals for the scratches when the plane landed in Bangor.

G. I reviewed photographs taken of ABP3's injuries and scratch marks that broke ABP3's skin are visible on ABP3's upper arm.

13. I conducted an interview with another able-bodied person who assisted with restraining Kedysheva (ABP4) who told me the following in substance:

A. ABP4 had observed a female passenger, later identified as Kedysheva, walking back and forth between her seat and the crew area at the back of the plane. ABP4 saw Kedysheva being rude to the cabin crew and recording them with her phone.

B. The last time Kedysheva went to the back of the plane it drew the attention of ABP4 because Kedysheva started yelling. A flight attendant called for help so both AB4 and their spouse ran over to help. ABP4 held Kedysheva's ankles while ABP4's spouse held Kedysheva's back down on the ground so someone could place restraints on her hands.

C. ABP4 recalled seeing Kedysheva reach for the exterior door before people tried to restrain her.

D. ABP4 saw Kedysheva bite a flight attendant, kick a flight attendant, scratch ABP3.

14. Upon arrival at Bangor International Airport, Kedysheva was detained by

US Customs and Border Patrol. I and a member of the U.S. Air Marshals service interviewed Kedysheva. Due to Kedysheva's limited English proficiency, a Russian language interpreter was present via speaker phone. Prior to the interview, I informed Kedysheva of her rights via the FBI FD-395 Advice of Rights form. I verbally read the entire form to Kedysheva and had the interpreter translate the statements. Kedysheva then read the form out loud in English, had the opportunity to ask questions about her rights, and agreed that she understood those rights. Kedysheva signed the advice of rights form and agreed to speak with me.

15. During the interview Kedysheva stated that she was traveling to visit a friend in New York for the friend's 40th birthday. Kedysheva consumed three alcoholic beverages, specifically red wine, within a few hours. Kedysheva then asked the flight crew for a whiskey and cola. One crew member gave her one, but after that the flight crew would not serve her alcohol. Kedysheva told me that when she was refused alcohol the flight attendants were rude to her. Kedysheva said that an Italian guy then came and took her phone from her and a physical altercation occurred.

16. Kedysheva stated that a female flight attendant was the cause of the incident and that Kedysheva hadn't done anything wrong. Kedysheva had video on her phone that would prove Kedysheva did not do anything wrong. Kedysheva stated that the video was of Kedysheva recording everything and that the videos were of the conversations where the flight attendant was rude to her. Kedysheva had concerns that the videos were deleted when her phone was taken from her by flight crew. Kedysheva also stated that other passengers were filming her and she was now "an Instagram star."

Kedysheva expressed concern that she was filmed and it would be shared. Kedysheva was asked how she would feel if someone was filming her while she worked and said it would not be pleasant. But Kedysheva did not record the flight crew's faces and just wanted to use the video as evidence.

17. Kedysheva stated that she was tied up for approximately 3 hours and was carried to a seat after being restrained. Kedysheva believed the incident occurred in the middle of the aircraft, and not near a door. Kedysheva denied reaching for a door at any point. Kedysheva denied making any threats to flight crew. Kedysheva did not remember how many times she was told to go back to her seat. Kedysheva did remember that the flight attendant did tell her the police would be called. Kedysheva responded by asking what she had done wrong. Kedysheva denied biting anyone. Kedysheva stated that she was unable to move anything but her head and cry. Kedysheva did not remember scratching anyone or fighting anyone, but it was possible, Kedysheva then stated in English "it was too much, so quickly. Maybe, Maybe, but I think its ok in this situation."

18. When Kedysheva referenced having videos on her phone that would show that she did nothing wrong. I informed Kedysheva that her phone was in custody of the FBI and asked if Kedysheva would give consent for the FBI to search the device so we could watch the videos and see what she was referring to. Kedysheva agreed, but before I reviewed the phone or asked any questions about the phone, I went over the FBI's FD-941 Consent to Search Computers Form with Kedysheva. Kedysheva grabbed the form and signed it before I was done reading it to her and having the interpreter translate the form into Russian. However, after she signed the form, I continued to explain the form

to her to ensure she understood what was being asked and was providing consent. Kedysheva understood and provided consent to search her iPhone. I located the videos and reviewed several of them with Kedysheva. Kedysheva repeated previous statements.

19. At the end of the interview Kedysheva stated that in hindsight she would have never got out of her chair and that she would now have done things differently.

20. During the interview, Kedysheva provided a passcode for her phone. Upon conclusion of the interview, I conducted a thorough review of the videos of the altercation with the cabin crew on Kedysheva's iPhone.

A. A video approximately 4 minutes and 50 seconds in length and was timestamped at 16:15, in an unknown time zone. During the video, the feet and legs of multiple flight attendants and Kedysheva can be seen. Kedysheva was wearing the same pants and sandals during the video she was wearing in the interview. As the video progresses, flight attendants can be heard denying Kedysheva service and stating that they believe Kedysheva is intoxicated. Kedysheva requests to be spoken to in Italian and then argues with the flight attendant about being refused alcohol. At times in the argument Kedysheva increases her volume and speaks over the flight attendants. Early in the video a flight attendant states in English that she is speaking with the captain. Later, the same flight attendant states that the captain has advised the flight attendant to have Kedysheva return to her seat. Towards the end of the video, Kedysheva begins to film the flight attendants' faces.

B. A video approximately 1 minute and 50 seconds in length and was timestamped at 16:17, in an unknown time zone. During the video, the feet and legs of multiple flight attendants and Kedysheva can be seen. The flight attendants offer Kedysheva multiple alternatives to alcohol. Kedysheva continues to argue with the flight attendants and offers to pay them for the drink. The flight attendants ask her to stop yelling.

C. A video approximately 1 minute and 19 seconds in length and was timestamped at 16:34, in an unknown time zone. The video shows Kedysheva's face as she narrates into the camera while walking down the aisle towards the rear of the plane. At approximately the 40 second mark, Kedysheva begins filming the rear flight deck and the flight attendants in it. Kedysheva begins to ask for alcohol. A flight attendant then informs Kedysheva that she is not allowed to film them and puts her hands up towards the camera covering her face and trying to block the lens. Kedysheva then argues with the flight attendant in Italian, while the flight attendant responds in English. The video ends with the flight attendant calling out "we need someone back here."

D. A video approximately 1 minute in length and was timestamped at 16:37, in an unknown time zone. During the video, the feet and legs of multiple flight attendants and Kedysheva can be seen. A flight attendant is now present who speaks to Kedysheva in Italian. At approximately the 40 second mark, Kedysheva lifts the camera and begins filming the same

flight attendant who previously told Kedysheva not to film cabin crew. The flight attendant says, "you're not allowed to film us." Kedysheva responds by saying "why" multiple times and continuing to film.

E. A video was identified that was approximately 2 minutes and 55 seconds in length and was timestamped at 16:39, in an unknown time zone. During the video, the feet and legs of multiple flight attendants and Kedysheva can be seen. In the video a flight attendant can be heard saying "he's going to land in Canada." Kedysheva continues to demand alcohol and the flight attendant refuses and offers alternatives. The flight attendant then tells Kedysheva to go back to her seat. Kedysheva does not return to her seat and continues to argue with the flight attendants. The flight attendant then informs Kedysheva that if she does not return to her seat then the plane will be forced to land and Kedysheva will be arrested. Kedysheva continues to argue with the flight attendants. The flight attendant then points out the seat belt sign is on and tells Kedysheva to return to her seat multiple times.

F. A video was identified that was approximately 20 seconds in length and was timestamped at 16:42, in an unknown time zone. In the video Kedysheva films herself returning to her seat.

G. A video was identified that was approximately 2 minutes and 6 seconds in length and was timestamped at 16:47, in an unknown time zone. During the video, the feet and legs of multiple flight attendants and Kedysheva can be seen. The video is filmed in the rear flight deck area. The flight

attendant tells Kedysheva that the seat belt sign is on and Kedysheva needs to return to her seat. Kedysheva continues to argue with the flight attendants. During the entire video a flight attendant can be heard communicating with Kedysheva in Italian.

21. Large portions of each video are in Italian. A translation has not yet been completed. Therefore, the characterization of Kedysheva's response as an argument is my belief based on the tone Kedysheva used and the English phrases Kedysheva uses during the conversation that are direct responses to flight attendants' orders and demonstrate noncompliance or continued demands for alcohol.

22. I, Casey Anderson, hereby swear under oath that the information set forth in this affidavit is true and correct to the best of my knowledge, information and belief, and that I make this oath under pains and penalties of perjury.

Dated: September 9, 2026

Casey Anderson
Special Agent
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED before me
This 9th day of September, 2026.

JOHN C. NIVISON
United States Magistrate Judge